# Affidavit of Brian E. Wages

I, Brian E. Wages, swear and state as follows:

## Background

1. I am a retired United States Air Force (USAF) officer with extensive military service background in joint and combined operations and training, including live and virtual training and systems, computer based training (CBT), and part-task trainers (PTT). I am a graduate of the US Armed Forces Staff College and the Royal Air Force College of Aerial Warfare (United Kingdom), was a classroom instructor the British National Defense College teaching joint warfare practices and procedures to military personnel from all of the NATO countries and services, and served as the USAF advisor to the Commander of Coalition Naval Forces during the 1990-1991 war with Iraq. From my USAF retirement in 1992 until my retirement from private industry in 2005, I led or participated actively in the development of contractor responses to requests for proposal (RFP) issued by various contracting agencies of the US Department of Defense, including those of the US Army, Navy, Air Force, and Joint Staff agencies. Many, if not the majority, of the RFPs with which I was involved were issued specifically for the development and execution of programs to train military personnel. My resume is attached

2. I was affiliated with SDS International, Inc. (SDS), Plaintiff in this action, from 1992-2001, and with Northrop Grumman Unmanned Systems in Rancho Bernardo, California, from 2001-2005. I have resided in the San Diego, California, area continuously since 2001 and have had no substantive interaction with the Plaintiff or its representatives on either a social or professional basis since 2001. In January 2008 I was retained by Christopher M. Johnson, Plaintiff's attorney, for my experience in dealing with Government military training-related contract proposals. Mr. Johnson requested that I review documentation provided by him and assess the technical approaches and manning proposed by SDS and HiPK LLC (HiPK) in response to Government solicitation W911SE-07-R-0016.

3. In preparing this affidavit I reviewed, inter alia, the following documents:

    - Solicitation No. W911SE-07-R-0016 issued by the US Army Contracting Agency (ACA), including the incorporated basic statement of work (SOW), performance work statement (PWS), and performance requirements summary (PRS) (collectively referred to as the "Solicitation").
    - The proposals submitted by SDS (the SDS proposal) and HiPK (the HiPK proposal) in response to the Solicitation.
    - Affidavits prepared by SDS employee William Bayer.

**Contains Protected Material not to Be Released Except in Accordance with a USCFC Protective Order**

- The responses to SDS's Request for a preliminary injunction that were filed by the Government and HiPK on 1 February 2008, particularly (a) the declaration prepared by JID employee James Tyson and submitted as the Exhibit 1 attachment to the Government's response and (b) the discussion of its proposal that was submitted as the Exhibit 1 attachment to HiPK's response.
- ACA's 21 August 2007 response to the Executive Level Agency Protest (ELAP) filed by SDS in 2007.

**The Purpose of My Affidavit**

4. I am submitting this affidavit in support of SDS's request for a preliminary injunction at the United States Court of Federal Claims (USCFC) in connection with the award of a contract to HiPK by the Army Contracting Agency (ACA) under Solicitation No. W911SE-07-R-0016 (Award). The purpose of my affidavit is to assist the Court in developing an understanding of one key difference between the technical approaches and associated manning capabilities proposed by SDS and HiPK in responding to that solicitation. That difference is the manner in which the two technical approaches proposed to address DoD's Training Transformation policy, and the concomitant impact on staffing reflected in each proposal.

5. This affidavit does not attempt to present an in-depth analysis of either offeror's proposal nor to assert that one approach was superior to the other. My sole intent is to verify and substantiate the fact that there was a major and obvious difference in the technical approach proposed by each offeror. Both approaches referenced the knowledge enablers associated with Training Transformation and offered management approaches to address them. There was, however, a clear difference in the staffing proposed by each party to satisfy DoD's Training Transformation policy and deal with the knowledge enablers referenced in the functional areas of the PWS. SDS intended to support the knowledge enablers through specific staffing (in both number of personnel and their skill levels) allocated to provide the base services. HiPK intended to provide staffing with the requisite unique skill sets to address Training Transformation when necessitated by Task Orders.

6. It is difficult to understand why the Government disputes the conclusion that the staffing proposed by SDS and HiPK reflected two distinctly different technical approaches. To my mind, SDS clearly proposed staff to address Training Transformation in the base services while HiPK equally clearly intended to bring on board unique staff appropriate for Training Transformation activities only in response to potential task orders. ACA and/or the Joint Interoperability Division (JID) recognized that basic fact when they reviewed the proposals initially.

7. For example, ACA's August 2007 response to the SDS ELAP addressed SDS's at-issue base services staffing, citing the JID's source selection evaluation board

(SSEB) as having identified SDS proposed personnel with such enabling skill specialties as Modeling and Simulation, Advanced Distance Learning (ADL), and Web/Computer Based Training as being directly related to the requirements of the potential task orders addressed in PWS subparagraphs 4.3.2 and 4.3.5 but not as part of the base services specified throughout PWS Section 3.0. (See ACA response, p. 7.) ACA further maintained that the PWS did not require that the offerors address Training Transformation as a basic requirement but only required it with regard to potential task orders (See ACA Response, p. 8.) ACA then specifically stated that SDS was the only offeror who added staff personnel to address Training Transformation in the base services. (See ACA Response p. 9.) Thus, at that point in time, JID and ACA had recognized that each proposal offered a different staffing approach. My conclusions below further substantiate that point.

**The Two Technical Approaches**

8. The key difference between the staffing and technical approaches in the comparative proposals is the manner in which SDS intended to furnish services related to the functions that referenced the knowledge enablers within certain subparagraphs of the PWS. The subparagraphs at issue are applicable to the technical functions for certain base services required by the Solicitation. SDS proposed to devote its ISD Manager and six full time equivalent (FTE) positions to address the PWS functions that referenced the knowledge enablers. Those positions were fully described in the Position Matrix incorporated into the SDS technical approach and are discussed at length in Mr. Bayer's affidavit. SDS's proposal made it clear that SDS intended to address the applicable Training Transformation functions with staffing included in the base services.

9. HiPK's proposal and its technical approach also referenced the exact same knowledge enablers that were discussed in SDS's technical approach. HiPK's organizational structure and management approach also stated that HiPK would address the knowledge enablers, and HiPK's technical approach described a management structure to address them. However, with the exception of a reference to a data base manager, HiPK's technical approach did not specifically identify any non-key staffing that it intended to devote to addressing the knowledge enablers as part of its provision of base services. Furthermore, HiPK's proposal specifically stated that it would furnish staffing to support work related to the knowledge enablers once the Government issued task orders. This is in clear contrast to SDS's technical approach and staffing, in which SDS specified that it intended to devote non-key staffing to addressing knowledge enablers in the base services.

10. Following are two specific examples that pertain to virtual training devices and website design and construction. These examples serve to contrast the staffing approaches in the two proposals at issue.

**Contains Protected Material not to Be Released Except in Accordance with a USCFC Protective Order**

**Development and Integration of Learning Media**

11. PWS section 3.1.5.13 required that the contractor both "maintain virtual training devices" and "assist in the development and integration of learning media for use with such virtual training devices." HiPK addressed that requirement under paragraph 1.10.2.9 of its technical proposal, and reiterated it in Exhibit 1 page 9 of HiPK's response to the SDS request for injunction. In that section HiPK specified that it would address that requirement through future task orders, and specifically stated that it did not intend to develop software upgrades. (See HiPK Response Exhibit 1.)

12. In contrast, SDS's technical proposal included a Modeling and Simulation Planner (LVC) as a base staff FTE position to assist in the development of learning media devoted to virtual training tools because that function specifically required development assistance, not simply maintenance. (See Paragraph 49 of Bayer's Affidavit.)

**Web Master and Web Page Management**

13. PWS subparagraphs 3.1.8.1 through 3.1.8.5 listed specific functions related to the design and building of web structures and the construction of web sites. Those functions supported distance learning and the delivery of distance learning across the internet. Those functions related directly to the development of web based learning tools, including graphics. (See Bayer Affidavit Paragraphs 28 and 50 through 51.)

14. Neither Exhibit 1 of HiPK's response to the request for injunction nor Mr. Tyson's declaration (Exhibit 1 to the Government's response) even attempts to address web design and development in the context of HiPK's proposal or in the context of the PWS requirements related to the knowledge enablers. HiPK and the Government's failure to address that requirement is surprising since SDS maintained consistently that web development was a key component of Training Transformation and argued that it devoted staff to meeting that requirement in supplying the base services. The failure of the Government and HiPK to address that issue, however, is not surprising in light of HiPK's technical approach and a comparison of that approach with SDS's technical approach.

15. HiPK's proposal does not specify any non-key qualified staff that would actually perform the work to design or construct web structures, let alone provide graphics support. It fails to address those functions even though those requirements were clearly specified under base Services within PWS subparagraphs 3.1.8.1 through 3.1.8.5. When discussing the base services related to web design and development functions, HiPK's proposal simply stated that its ISD Manager would assign that responsibility to the data base manager. (HiPK Proposal

paragraphs 1.7.2.3 and 1.13.2). The qualifications of HiPK's data base manager were listed in the Table 1.2.4.1 of HiPKs proposal. That position does not have any specified experience in web design or development.

16. HiPK's management structure assigned responsibility for management of web design and web site construction to the ISD Manager. (See HiPK Proposal Paragraphs 1.2.3.2.4, 1.5.1.4, 1.7.2.3, and 1.13.2.) That person himself may have been qualified to manage the design and construction of web-based and SCORM-conformant distance learning tools, but HiPK's proposal failed to identify any specific qualified staff to actually perform the development work in the base services. HiPK's technical approach promised only to devote qualified subject matter experts in the event that the Government issued task orders for such services. (See HiPK Proposal paragraph 1.16.2.)

17. HiPK's approach to web design and construction is completely different from SDS's technical approach in that SDS clearly intended to devote four qualified FTE positions to web design and construction, including graphic design and ADL programming. (See Bayer Affidavit Paragraphs 50 and 51.)

Further Affiant sayeth not:

Date: 5 Feb 2008

BE Wages
Brian Wages

Notary public: P. Mena

My commission expires: June 10, 2009

P. MENA
Commission # 1586546
Notary Public - California
San Diego County
My Comm. Expires Jun 10, 2009

Contains Protected Material not to be Released Except in Accordance with a USCFC Protective Order