**Affidavit of George Gennin**

I George Gennin swear and state as follows:

**Background and Affidavit Purpose**

1. I am the President of SDS International, Inc. ("SDS"). I am submitting this affidavit in support of SDS's request for a preliminary injunction at the United States Court of Federal Claims ("USCFC") in connection with the award of a contract to HiPk, Inc. (HiPk) by the Army Contracting Agency ("ACA") under Solicitation No. W911SE-07-R-0016 (the "Award"). The Solicitation at issue concerns training services for Joint Interoperability Division ("JID") HQ, U.S Army Forces Command ("FORSCOM").

2. My affidavit relates to three issues. First, for reasons explained below, SDS will suffer an irreparable injury if it does not receive a preliminary injunction against the Award. Second, SDS still possesses the ability immediately to begin providing services to the government in the event that the court grants the Preliminary Injunction. This will assure that there is little if any disruption to the training services at issue. Third, my affidavit will address two issues regarding the merits of SDS's contention that HiPk failed to comply with the terms of the Solicitation. SDS knows that HiPK failed to offer a Link-16 Network Design Engineer with its initial proposal that met the experience and education requirements specified under sub-paragraph 4.4.4 of the Performance Work Statement (the "PWS") contained in the Solicitation. Furthermore, SDS also knows that immediately after ACA re-confirmed the award to HiPk, HiPk added a member of SDS's technical team to provide Joint Interface Control (JICO) Communications Services specialist required under sub-paragraph 4.4.2 of the PWS.

3. As President of SDS, I have responsibility for monitoring all communications between SDS personnel and its government customers. I also have responsibility for assuring that SDS has sufficient personnel with the knowledge and experience to meet all requirements in any contract it receives. SDS is the incumbent contractor and has been providing training services to JID/FORSCOM under a prior contract for the past five years. Thus, in my capacity as SDS's President, I regularly obtain information concerning the services covered by the Solicitation. As SDS's President, I also have overall responsibility for supervision of SDS's proposals in response to solicitations issued by various government agencies. In that capacity I review all requirements contained in solicitations for which SDS intends to submit offers. I have personally reviewed all requirements contained in the Solicitation at issue in this protest. In connection with the SDS's submission of proposals, I also have responsibility for review of all technical aspects of SDS's proposals including resumes SDS submits with its offers. I am also familiar with the issues SDS has raised in prior protests concerning the award, and

I have had discussions with my counsel regarding non-protected information that related to those protests. As President I have personal knowledge of SDS's anticipated monthly profit on the potential contract at issue since I discussed SDS's pricing with our Vice President and Chief Financial Officer, William Flood. Unless otherwise specified, all statements in my Affidavit are based upon my own personal knowledge.

**Irreparable Injury to SDS**

4. If the Court refuses to enjoin HiPk's performance it becomes increasingly difficult of SDS to transition back into the project at issue. In the near term however, SDS can expeditiously transition back on to the project so that the government does not suffer from a disruption in services. Furthermore, SDS continues not to earn the anticipated profits from the contract that it would have earned had it received the award.

5. SDS is currently losing over $30,000 a month in profit that it would be earning had it received the contract. Even if it receives an award today, SDS will never earn the anticipated profit that it would have earned had it received the award. SDS should have obtained the contract, and SDS's financial injuries increase the longer it can not provide the services under a contract that it should have obtained had ACA properly conducted the acquisition.

6. The longer this matter lingers the more difficult it becomes for SDS to reconstitute the experienced team necessary to meet the Training Services. As stated in my prior Affidavit, the Solicitation at issue required that the successful awardee utilize staffing with high level information technology ("IT") skills, education and experience. While acting as the incumbent contractor, SDS has hired, trained, and retained its own staff of personnel with many of those specific skills. Furthermore, in connection with its proposal in this procurement SDS also entered into teaming arrangements with other companies to complement SDS's own staff so that the proposed team possessed the ability to offer the services at issue. Once the Government refused to stay performance of the Award, it directed SDS to transition off the project. SDS was forced to lay-off some of its staff and transfer other personnel to other work.

7. As stated in my previous Affidavit, if SDS is later successful in obtaining a permanent injunction against the HiPk award, many of the critical personnel identified in SDS's proposal may not be available to perform a contract awarded to SDS in response to the original Solicitation. That will of course depend on the time in which the Court issues a permanent injunction. Those same personnel also may not be available for SDS to utilize in response to a new solicitation in the event that ACA and/or JID/FORSCOM determine to conduct an entire new acquisition.

8. On the other hand, in the near term SDS, and its teaming partners have personnel available to provide the training services. SDS and its Teaming Partners are ready, willing and able to provide those services on behalf of the JID/FORSCOM. Thus, in the near term there will be little if any disruption in the services at issue. I want to explain the basis of this assertion in the next two paragraphs.

9. SDS was the incumbent contractor for the past five years and possesses the institutional knowledge necessary to offer JID an expeditious transition back onto the project. SDS can be at ninety five percent (95%) capacity within three business days, and at ninety eight percent (98%) capacity within ten business days. SDS is prepared to rehire all of the Joint Interface Control Officer (JICO) instructors and Subject Matter Experts required under sub-paragraph 3.1.2.1.1 of the PWS. Those individuals were employed by SDS on the prior contract and can be transitioned back into SDS's employment simply by executing the necessary paperwork.

10. SDS also can get a substantial amount of critical staff into the project in less than three business days, and most of the balance of the critical staff back into the project within ten business days. For example, SDS's proposed project manager, Jeff Moddle is still employed by SDS and lives in Atlanta. He is available immediately to assist in the transition and assume duties as Program Manager. SDS proposed Neal Hesser as its Link 16 Network Design Engineer, which was a critical key position under paragraph 4.4.4 of the PWS. Mr. Hesser is still employed by SDS and is working on another SDS contract. SDS can and will immediately transfer him back to the JID contract to help with the transition. Further, SDS proposed Tony Brodhead as the Information Systems/Network Administrator (another key position), and he still works for SDS in Atlanta and is available to return to the JID. Additionally, several of the other personnel identified in SDS proposal reside in the Atlanta area and are available to return to SDS for work at the JID. Finally, SDS proposed "Hap" Scandrett as its JICO Communications Specialist. Mr. Scandrett provided these services under the prior contract through a subcontract between SDS and Mr. Scandrett's company General Dynamics Information Technology (GDIT). GDIT is one of SDS's teaming partners on SDS's current technical proposal. SDS can simply subcontract with GD to obtain his services for this contract. SDS also has maintained continuous contact with its teaming partners, advising them to be prepared for a quick-turn transition – and each has committed to support. For example, ManTech International Corporation has retained the proposed Instructional Systems Designer (a key position) in a quick deployment status to support the transition when needed.

## The Merits of SDS's Request for a Preliminary Injunction

11. The Solicitation required that the offerors' technical proposals offer sufficient staffing necessary to meet all the functions specified in the PWS. Paragraph L.3.B of the Solicitation and the Key Functions clause under of the Section 3.2.7

of the PWS required that offerors identify, with their initial proposals, the specific individuals proposed for the key staffing positions required during performance of the contract at issue. Section 4.4 of the PWS described the key staffing positions and the required experience and education for each of the key positions. One of the key staffing positions was Link-16 Network Design Engineer as described under Sub-paragraph 4.4.4 of the PWS. Sub-paragraph 4.4.4 contained detailed education and experience requirements for the Link-16 Network Design Engineer. Another critical position was the JICO Communications Specialist, whose functions were described under sub-paragraph 4.4.2.

12. SDS's Agency protest alleged that HiPk had not proposed sufficient key and non-key staffing necessary to meet the functional requirements specified in the PWS incorporated into the Solicitation. While SDS's Agency Protest was pending, SDS learned directly from the Government, specifically through LTC Sorensen and JID employee Mr: James Tyson that HiPk had proposed Mr. Steve Frolen to fill the Link-16 Network Design Engineer position. Mr. Frolen is a former SDS employee who was an instructor early-on for the prior JID contract.

13. Based upon his tenure as a prior SDS employee, I know that Mr. Frolen does not possess the qualifications specified under subparagraph 4.4.4 of the PWS because Mr. Frolen lacks the extensive experience in JTAO data link interoperability doctrine, tactics, techniques, procedures, and training, with the specificity in required emphasis and experience in JTIDS network design and operations. Further, Mr. Frolen does not have the qualifications to assist the JNDL staff in providing JTIDS/MIDS use and pulse deconfliction advice to the Joint Staff to ensure compliance with national directives, instructions, and restrictions. He also does not have the experience to act as the JNDL POC for issues relating to Time Slot Duty Factor, pulse deconfliction, and Link-16 electromagnetic interference and he does not meet the requirement as having instructed service technical course on the subject of JTIDS network design.

14. SDS knows that HiPK proposed to use Mr. Frolen as the Link-16 Network Design Engineer because Mr. Neal Hesser (SDS employee then at the JID) informed Mr. Bill Bayer (SDS employee at Corporate Headquarters) on or about 12 August 2007 that Mr. James Tyson and LTC. Sorenson of the JID had told him that the nominee for the Link-16 Network Design Engineer position was Mr. Frolen. Mr. Bayer notified me.

15. SDS also knows that after SDS first raised this issue in its agency protest, the Government subsequently directed HiPk not to use Mr. Frolen as the Link-16 Network Design Engineer. SDS knows this to be a fact because Mr. James Tyson told Mr. Hesser that the Government had rejected Mr. Frolen as the Link-16 Network Design Engineer. Mr. Hesser notified me. Based upon the fact that the Government ordered HiPk to replace Mr. Frolen, the Government itself recognized, that after first making an award to HiPk, Mr. Frolen lacked the qualifications specified under sub-paragraph 4.4.4 of the PWS. Thus the

government effectively allowed HiPK to amend its technical approach after it had already received an award.

16. SDS also knows that, after HiPk began transitioning into the contract in January 2008, HiPk was immediately directed by the JID to subcontract with GDIT to obtain Mr. Scandrett's services as a JICO Communications Specialist. I know this to be a fact because Mr. Jerry Van Patten (GDIT Vice President) told me. [

Further Affiant sayeth not:

Date: 1|31|08

George Gennin

Notary public: Jerrid Campbell

My commission expires: May 31, 2010