**IN THE UNITED STATES**
**COURT OF FEDERAL CLAIMS**
**BID PROTEST**

**REDACTED VERSION**

| | |
|---|---|
| SDS INTERNATIONAL, INC. | |
| Plaintiff, | |
| v. | USCFC No. 07-881 C<br>Judge Weise |
| THE UNITED STATES | |
| Defendant. | |

**PLAINTIFF'S AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

**COMES NOW,** Plaintiff SDS International, Inc. ("SDS"), by and through undersigned counsel, seeking injunctive and declaratory relief against the Army Contracting Agency pursuant to 28 U.S.C. § 1491(b)(1), and the Rule 65 of the Rules of the United States Court of Federal Claims. SDS seeks to enjoin continued performance of a contract awarded to HiPK, Inc. ("HiPK") by the U.S Army Contracting Agency ("ACA") under Solicitation No. W911SE-07-R-0016 (the "Award"). SDS also seeks a declaration that the Award was improper and in violation of the Competition in Contracting Act, 10 U.S.C. § 2305(b)(1) (CICA) and an order directing ACA to terminate for convenience the contract awarded to HiPK because HiPK's technical proposal was not technically acceptable under the terms of the Solicitation. ACA's entire best value evaluation and award procedure was fundamentally flawed because it compared the lower price of one approach that did not meet the terms of the Solicitation (HiPK) against the prices of SDS's technical approach, which did reflect the terms of the Solicitation. The award decision also was based upon a fundamentally flawed price realism analysis.

## PARTIES

1. Plaintiff, SDS, is a Virginia corporation whose principal office is located in Fredericksburg, Virginia. SDS is engaged in the business of providing training support and logistics services to government agencies worldwide.

2. The Defendant is the United States of America acting through ACA, a unit within the Department of the Army.

## JURISDICTION AND STANDING

3. Jurisdiction in this Court is based on the Tucker Act, 28 U.S.C. § 1491. SDS alleges that an executive agency of the United States Government, ACA, violated CICA in connection with a federal procurement and that ACA's actions constituted a breach of the implied contract of fair dealing between the United States and SDS.

4. SDS has standing as an interested party to bring this action since SDS is an actual bidder whose economic interests were directly affected by the illegal award to HiPK. Pursuant to 28 U.S.C. § 1491(b)(1), the Court has jurisdiction to render judgment on an action by an interested party objecting to an award of a contract based upon alleged violation of a statute or regulation. SDS submitted a timely offer in response to the Solicitation and thus qualifies as an actual bidder. SDS's direct economic interests are obviously affected by the illegal award to HiPK since SDS is both an actual bidder and is currently providing the services at issue.

## FACTUAL BACKGROUND

SDS'S Continued Performance

5. SDS is the incumbent contractor providing training services to JID/FORSCOM. SDS had been providing these services for the past five years.

6. During SDS's prior protests to ACA and to the Government Accountability Office ("GAO"), SDS has continued to provide the services to the using agency, JID/FORSCOM, through contract extensions.

7. SDS's current contract is set to expire on December 23, 2007. SDS is available to continue to provide the training services thereafter in the event that ACA extends that contract

The Solicitation, Performance Work Statement, General Provisions and Instructions

8. On February 28, 2007, ACA issued Solicitation No. W911SE-07-R-0016 seeking firm-fixed-prices to furnish training, exercise and operational base support services in support of JID/FORSCOM's mission (the "Training Services"). Under the terms of the Solicitation, offerors were required to submit fixed prices for all the Contract Line Items ("CLINs") listed under Section B. Under CLIN Numbers 0001AA, 1001AA, 2001AA, 3001AA, and 4001AA, offerors were required to propose fixed monthly unit prices for Base Support Training Services (the "Base Support Services") for an initial seven month (September 1, 2007 through March 31, 2008) base year performance period and each of four option year periods thereafter.

9. Under CLIN Numbers 0001AB, 1001AB, 2001AB, 3001AB, and 4001AB, offerors were also required to submit fixed hourly rates for nine specified labor categories that were applicable to potential Task Orders that JID/FORSCOM

anticipated issuing during the Base Period and the four option-year periods. Each of the categories contained an estimated number of hours associated with the potential Task Orders.

10. The Solicitation incorporated a PWS that described the specific Training Services functions sought by JID/FORSCOM for both the Base Support Services and potential Task Orders. The tasks covered by the Base Services were described under PWS Section 3.0 and the subsections there under. The potential Task Orders were described within PWS Section 4.3 and subsections 4.3.1 through 4.3.5.

11. The Solicitation advised offerors to submit a Quality Proposal, Volume II that consisted of both a written proposal and an oral briefing (the "Quality Proposal"). Paragraph L.3 also specified that offerors would be evaluated based upon an oral presentation.

12. The Solicitation directed that each offeror's Quality Proposal address the offeror's proposed approach and resources necessary to meet all the requirements contained in the PWS.

13. The Solicitation required that each offeror's written proposal include information addressing four of the technical sub factors specified under Section M (i.e., technical approach, management approach, and transition plan and contract administration/quality control).

14. The Solicitation required that each offeror's written proposal demonstrate the offeror's approach for providing specific resources and methodology necessary to accomplish all functions required by the PWS. Offerors were directed to include the number of personnel and staffing that the offeror intended to devote to the functions specified in the PWS.

15. The Solicitation required that each offeror's Quality Proposal address the offeror's proposed technical approach and resources necessary to meet all the requirements contained in the PWS.

16. The Solicitation specifically directed that each offeror's technical approach address how the offer intended to develop and implement Instructional Systems Design (ISD) and propose resources and staffing necessary to implement the functions outlined in the PWS.

Key Staffing Requirements Under the Solicitation

17. Both the Solicitation instructions and the functions specified in the PWS required that offerors propose, with their initial offer, key staffing with education and experience necessary to ensure contract performance. Absent death, illness, or employment termination, offerors were prohibited from substituting proposed key staffing during the first six months of performance. The key staffing requirements were specified under Paragraph 3.2.7 (Key Functions Clause) of the PWS.

18. Paragraph 4.4 of the PWS identified the specific job descriptions, minimum experience, education and qualifications of the individual positions that were covered by the key staffing requirements. The specific job descriptions under Subparagraphs 4.4.1 through 4.4.6 required that responsive offerors provide full time support for duties described for each of the positions.

19. Sub-paragraph 4.4.4 required that each offeror propose, as part of its initial proposal reflecting its technical approach, a Link-16 Network Design Engineer to assist JID/FORSCOM in establishing a JTIDS Network Design Library and providing Link-16 network design configuration management.

20. Subparagraphs 4.4.1, 4.4.2, 4.4.3, 4.4.5 and 4.4.6 provided the position descriptions and required experience and education for full time support in the areas of Link 16 Spectrum Deconfliction Support (4.4.1) Joint Interface control Officer (JICO) and JICO Communication Support (4.4.2), Information Systems and Network Administration (4.4.3), Joint Tactical Information Distribution Support (JTIDS) (4.4.4), Joint tactical Air Operations (JTAO) Multi-TADIL Operations Instructor/Training Analyst Support (4.4.5), and Instructional Systems Development (ISD) and design.

21. Responsive offerors [redacted]

The Specified Evaluation and Award Criteria in the Solicitation

22. Paragraph M.2.a of the Solicitation stated that ACA would make an award to the offeror whose proposal represented the best value to the government in terms of all the stated evaluation factors and sub-factors. ACA intended to make an integrated assessment of each offeror's performance capability and performance risks and ACA reserved the right to make an award to a higher rated, higher priced offer.

23. Paragraph M.3 (Evaluation Approach) specified that the ACA would assess the relative risk associated with each proposal as part of the best value evaluation process. In the solicitation, ACA represented that it would assess both proposal risk and performance risk. Proposal risk would include an assessment of both the technical risk and price risk represented by each offeror's proposed approach to meeting the government's requirements.

24. Paragraph M.4 contained three evaluation factors - Technical, Past Performance, and Price. Paragraph M.4.a listed five Technical sub-factors, each with equal

importance. Paragraph M.4.b specified the relative importance among the three evaluation factors. Technical was the single most important factor, followed by Past Performance and then Price. Technical was significantly more important than Price, and Technical and Past Performance, when combined, were together significantly more important than Price.

25. Paragraph M.4.a. also specified that ACA would assign adjectival ratings to the technical merit, past performance risk and proposal risks to each of the offerors' proposals. The adjectival ratings and applicable definitions were included under three tables contained in Section M. The adjectival ratings for technical merit included Exceptional, Very Good, Fair, Marginal and Unacceptable. The past performance adjectival ratings included Low Risk, Moderate Risk, High Risk and Unknown. The adjectival ratings under proposal risk included Low, Moderate and High Risk.

Price Realism Evaluation Requirements in the Solicitation

26. The Solicitation specified that ACA would conduct a price realism analysis to confirm that each offeror's technical approach reflected a firm understanding of the ACA's training requirements.

27. Sections M.3 and M.4 of the Solicitation specified that ACA would assess the relative risk associated with each offeror's technical approach as part of the best value evaluation award process and assign adjectival ratings based upon ACA's assessment of the proposal risk inherent in each offeror's proposed technical approach.

Training Transformation Requirements in the PWS

28. The PWS specified that the Training Services and the training programs covered by the Solicitation were required to adhere to the Department of Defense ("DoD") Training Transformation policies.

[redacted] Training Transformation is a DoD program designed [redacted]

[redacted] Offerors that responded to the Solicitation were required to propose sufficient staffing and resources necessary to meet the DoD policy initiatives [redacted]

[redacted] Both the [redacted]

32. Implementation of DoD's Training Transformation policies [redacted]

[redacted].

[redacted] The [redacted]

[redacted]

- [redacted]).

[redacted]

35. The [redacted]

36. Addressing Training Transformation [redacted]

[redacted].

Training Transformation Requirements Under the PWS-Base Services

37. The Base Services specified under PWS Section 3.0, and the individual subsections there under, contained [redacted]

38. For example, [redacted]

[redacted] The following sections of the PWS [redacted]

[redacted]

Training Transformation Requirements Under the PWS-Potential Task Orders

40. The potential Task Orders described under PWS Section 4.3, subsections 4.3.1 through 4.3.5 also require utilization of Training Transformation initiatives. For example, [redacted]

[redacted] The potential Task Orders under PWS subsections 4.3.1 through 4.3.5 represent additional services over and above the tasks required under the Base Services specified under PWS Section 3.0. Accomplishment of some the Base Service tasks under PWS Section 3.0 and completion of some of the potential Task Orders under PWS Section 4.3 both required consideration of DoD's Training

Transformation initiatives and policies since [redacted]

[redacted] There is no language anywhere in the PWS [redacted]

43. Furthermore, [redacted].

44. Paragraph 3.2.6 of the PWS contained a description of the procedures JID intended to utilize in ordering work under the potential Task Orders that were described under paragraphs 4.3.1 through 4.3.5.

45. finally, sub-paragraph 3.2.6.1 specified that the work covered by the potential Task Orders was in addition to the Base Services technical requirements described under Paragraph 3.1 of the PWS by specifying:

> Additional work or requirements relating to or supporting the JID core competencies may be performed as task orders issued in accordance with the terms of this contract

<u>SDS's Offer</u>

[redacted] On April 23, 2007, SDS submitted its offer and technical proposal in response to

the Solicitation and the PWS requirements. SDS's [redacted]

47. SDS's offer price [redacted]

48. Both SDS's written proposal and its oral briefing slides demonstrated SDS's approach to meeting all the functional requirements contained in the PWS, and demonstrated that SDS had the resources and staffing necessary to meet those requirements. [redacted]

[redacted]

50. SDS's proposal [redacted]

[redacted].

JID/FORSCOM's Evaluation of SDS's Technical Approach

[redacted] On April 16, 2007, JID prepared a document entitled "Consensus" that reflected its evaluation of SDS's technical proposal. JID [redacted]

[redacted] JID's Consensus [redacted]

[redacted]

The HiPK Award and Initial Debriefing

[redacted] By email dated July 9, 2007, SDS received notice of the award to HiPK in the amount of $22,655,349 (the "Award Notice"). The Award Notice stated [redacted]

[redacted] On July 23, 2007, the ACA Contracting Officer provided SDS with a debriefing (the "Debriefing"). The Debriefing [redacted]

[redacted]

55. One of the strengths ACA had noted [redacted].

[redacted] The Debriefing, [redacted]

[redacted] The Debriefing also [redacted]

[redacted]

SDS's Agency Protest and ACA's Initial Response

58. On July 17, 2007, SDS filed an executive-level agency protest with ACA (the "SDS Agency Protest"). The SDS Agency Protest alleged that the award to HiPK violated CICA because HiPK failed to offer critical and non-critical staffing, as well as sufficient resources that were necessary to meet all of the functional requirements contained in the PWS sections related to Training Transformation. SDS alleged that ACA did not follow the evaluation and award criteria specified in the Solicitation because ACA had not prepared a rational Independent Government Estimate ("IGE") or conducted a reasonable price realism analysis, which was necessary to assess proposal risks prior to assigning the adjectival ratings related to proposal risk.

59. SDS also alleged that ACA failed to follow the specified evaluation and award criteria applicable to a best-value procurement, and instead simply made an award to the lowest priced technically acceptable proposal without conducting an adequate and reasonable price/technical trade-off analysis. Finally, SDS also alleged that ACA failed to properly document its price/technical trade-off analysis

60. On August 21, 2007, ACA denied the SDS Agency Protest. In response to SDS's allegations that HiPK had not offered sufficient staff or qualified key personnel to meet the Training Transformation requirements set forth in the PWS, ACA specifically admitted [redacted] ACA's position was that the Training Transformation requirements were limited to the potential Task Orders specified under paragraphs 4.3.2 through 4.3.5 of the PWS, and were not required to be addressed as part of the Base Support Training Services described in the balance of the PWS.

HIPK's Failure to Offer a Qualified Link 16 Network Design Engineer

[redacted] On or about August 12, 2007, while SDS's Agency Protest was pending, JID/FORSCOM personnel identified the individual that HiPK had proposed to utilize as HiPK's Link 16 Network Design Engineer when HiPK had submitted its initial proposal. JID/FORSCOM [redacted]

[redacted] Mr. [redacted]

SDS's GAO Protest

63. On August 28, 2007, SDS filed a protest at the GAO and repeated the arguments it had made in its Agency Protest. Specifically, SDS argued that the Award to HiPK violated CICA because HiPK's technical proposal was not technically

acceptable under the terms of the Solicitation and/or the functional requirements contained in the PWS incorporated into the Solicitation.

64. SDS maintained that HiPK's proposal failed to offer sufficient staffing resources necessary to meet all of the functional requirements in the PWS. SDS alleged that HiPK's proposed technical approach had failed to include staffing required to implement and utilize the information technology knowledge Enablers required to deliver the training services per the functions specified in the PWS.

65. SDS also maintained that HiPK failed to offer personnel whose qualifications and experience met the key staffing requirements specified in the PWS. SDS identified HiPK's failure to propose a qualified Link 16 Network Design Engineer as part of its initial proposal and maintained that that was a specific example of HiPK's failure to submit a proposal that conformed to the Solicitation requirements.

66. SDS maintained that it was prejudiced because HiPK's failure to submit a technically acceptable proposal enabled HiPK to offer a lower price than SDS. In addition, SDS maintained that it was prejudiced by ACA's erroneous assignment of adjectival ratings to SDS's and HiPK's proposals. In connection with the assignment of the adjectival ratings related to proposal risk, JID/FORSCOM had failed to conduct a pre-award price realism analysis as required under the terms of the Solicitation, and had not prepared a reasonable IGE that should have been used to support the price realism analysis.

**67.** Finally, SDS maintained that ACA's entire best value evaluation and award procedure was fundamentally flawed because it compared the lower price of one approach that did not meet the terms of the Solicitation (HiPK) against the prices of SDS's technical approach, which did reflect the terms of the Solicitation

68. Early in the GAO protest, GAO refused to allow SDS to proceed with any arguments related to ACA and JID/FORSCOM's best value analysis or any SDS arguments that were based upon the contents of the HiPK proposal.

69. GAO, however, allowed SDS's protest to proceed on two specific issues. The first issue concerned that issue of whether the Solicitation required that offerors address the DoD Training Transformation initiative in their technical approaches. The second issue related to the extent to which ACA and JID/FORSCOM were required to conduct a price realism analysis in evaluating proposals and making an award.

ACA's Agency Record Submitted to GAO

70. On September 28, 2007, ACA filed its Agency Report and maintained that the offerors were not required to address DoD's Training Transformation policies—which were specified in the DoD policy directives that were incorporated into the Solicitation (the "Directives")—**anywhere** in their technical proposals.

71. ACA argued that the Directives simply represented DoD's Training Transformation policy and that the offerors were not required to address that policy because the individual PWS functions specified in the PWS subsections applicable to the delivery of the Training Services did not specifically reference the specific DoD policy Directives.

72. ACA, however, also took the position that the offerors were required to address Training Transformation under one specific task specified in the PWS, a task that was applicable to one of five types of potential Task Orders described in the Solicitation.

73. ACA made multiple submissions to GAO regarding the government's price realism analysis and supporting IGE.

[redacted] ACA's initial September 28 Agency Report maintained that ACA had conducted a price realism analysis utilizing [redacted]

75. While the Agency Report relied upon several documents that allegedly supported the IGE, [redacted]

[redacted] One of the documents [redacted]

[redacted] The Agency Record [redacted]

[redacted] ACA maintained, in several submissions to GAO, that it prepared the new IGE prior to the issuance of the Solicitation. The Agency Record, however, [redacted]

[redacted] The Agency Record demonstrated that JID/FORSCOM [redacted]

[redacted] The other documents in the initial Agency Record included [redacted]

[redacted] ACA subsequently amended the Agency Record three times. One of the submissions [redacted]

[redacted]

82. Through its multiple submissions to GAO, ACA was never able to demonstrate that the IGE amount used to support ACA's and/or JID/FORSCOM's price realism analysis accurately reflected the work required in the PWS and the Solicitation.

83. All of the documents that ACA maintains constitute and support the Agency Record have [redacted].

84. During an outcome prediction conference on November 28, 2007, GAO informed ACA that it intended to sustain SDS's protest in part on the basis that ACA's price realism analysis could not support the award decision. The record did not

demonstrate that the IGE could support a rational analysis since it had not considered all of the applicable performance costs or reflected the labor categories specified in the Solicitation.[1]

85. To date, ACA and/or JID/FORSCOM have never prepared an IGE that actually reflected the costs of the Training Services as described in the PWS and the Solicitation.

[redacted] Furthermore, as a result of the corrective action, [redacted] The record does not [redacted]

**<u>COUNT I</u>**

**SDS IS ENTITLED TO INJUNCTIVE RELIEF**

87. SDS incorporates by reference the allegations set forth in Paragraphs 1 through 87 above.

88. The award to HiPK violated CICA because HiPK's proposal failed to include a technical approach that met all the functional requirements specified in the PWS.

89. The Solicitation and PWS specifically directed offerors to consider DoD's Training Transformation policy Directives when preparing their technical approaches to providing the Training Services.

---

[1] As discussed in SDS's Memorandum that accompanies its Motion for a Preliminary Injunction, GAO stated that it would not sustain the protest on the Training Transformation issue.

90. The PWS contained a number of specific functional requirements that were applicable to the Base Services sought under the Solicitation.

91. The PWS and Solicitation directed offerors to propose sufficient staffing that possessed the skills necessary to meet all the functional requirements specified in the PWS.

[redacted] Certain PWS subsections applicable to the Base Services [redacted]

[redacted] A technical approach consistent with the Solicitation had to include sufficient staffing with the information technology skills [redacted]

94. HiPK's proposal [redacted]

[redacted] The Solicitation directed all the offerors' technical approaches [redacted]

[redacted] HiPK's proposal [redacted]

97. As a result, HiPK's proposed technical approach on its face demonstrated [redacted] Thus HiPK's proposal was non- compliant and could not be accepted for award.

98. Several of the individuals that HiPK proposed [redacted].

99. For example, HiPK proposed to utilize [redacted] Thus HiPK's proposal was non- compliant and could not be accepted for award.

[redacted] While SDS's prior protests and /or this action was pending, JID directed HiPK [redacted]

101. The Link 16 Network Design Engineer the is a key position and, under the PWS key functions clause (PWS paragraph 3.2.7), HiPK was prohibited from substituting key personnel for the first six months of performance.

102. HiPK's original technical approach to providing critical key personnel needed to fulfill the support services and the position descriptions under sub-paragraph 4.4.4 of the PWS did not comply with the Solicitation requirements since HiPK had to replace [redacted].

103. ACA and/or JID's waived the Solicitation requirements by making an award in response to HiPK's original non-compliant technical approach to meeting the requirements under sub-paragraph 4.4.4, and then allowing HiPK to substitute another individual in place of [redacted].

104. After ACA determined to confirm the original award to HiPK, and directed HiPK to resume performance, JID then directed HiPK to [redacted].

105. SDS's technical approach had proposed [redacted] PWS.

[redacted] HIPK's original technical approach was non-compliant because HiPK [redacted]

107. ACA and/or JID's improperly waived the Solicitation requirements that offerors propose sufficient full time critical key staffing necessary to meet the critical JICO Communications Specialist support functions under sub-paragraph 4.4.2 of the PWS.

108. ACA and/or JID awarded the contract in response to HiPK's original non-compliant technical approach to meeting the requirements under sub-paragraph 4.4.2, and then subsequently directed HiPK [redacted].

## COUNT II
## SDS IS ENTITLED TO INJUNCTIVE RELIEF

109. SDS incorporates by reference the allegations set forth in Paragraphs 1 through 108 above.

110. The award to HiPK violated CICA because the award was based upon a price/technical trade-off evaluation of HiPK's proposal, a proposal that did not meet the Solicitation requirements.

111. HiPK's proposal and the technical approach therein did not comply with the Solicitation requirements. Thus, ACA and/or JID/FORSCOM could not utilize that proposal in conducting a price/technical trade-off evaluation that complied with CICA.

## COUNT III
## SDS IS ENTITLED TO INJUNCTIVE RELIEF

112. SDS incorporates by reference the allegations set forth in Paragraphs 1 through 111 above.

113. The award to HiPK violated both CICA and the implied-in-fact contract between the offerors and the government that requires the government to treat all offerors fairly.

114. The award was based upon a best value analysis that erroneously compared the prices and technical approach of one proposal, which complied with the requirements set forth in the Solicitation, with the prices and technical approach included in HiPK's non-conforming proposal.

115. The government's best value award decision was based on the conclusion that both SDS and HiPK had submitted technically acceptable offers.

116. The government erroneously concluded that HiPK's proposal was technically acceptable, even though that proposal did not conform to the Solicitation requirements.

117. The best value award decision ultimately was based upon HiPK's lower price. Thus the award violated both CICA and the implied-in-fact contract to treat all offerors fairly because HiPK's lower price was based upon a non-conforming offer.

**COUNT IV**

**SDS IS ENTITLED TO INJUNCTIVE RELIEF**

118. SDS incorporates by reference the allegations set forth in Paragraphs 1 through 117 above.

119. The award to HiPK violated CICA because the award was based upon a best value analysis that did not reflect a rational price realism analysis.

120. The Solicitation required ACA and/or JID/FORSCOM to conduct a price realism analysis in support of the award decision. The price realism analysis measured the offerors' understanding of the technical requirements.

121. Under the terms of the Solicitation, the price realism analysis supported the assignment of adjectival ratings applicable to proposal risk. Proposal risk was listed as an evaluation factor.

122. Based upon its price realism analysis, the government [redacted].

123. ACA and/or JID/FORSCOM chose to utilize an IGE to support that price realism analysis.

124. The dollar amounts in the IGE that allegedly supported the evaluation and award decision do not reflect the PWS requirements or the pricing scheme specified in the Solicitation. Thus the IGE could not be used to support a rational price realism analysis or support an award decision.

125. The adjectival ratings applicable to proposal risk that supported the award decision were originally based upon a specified IGE amount. (see Paragraph 86 above.)

126. The government subsequently increased the IGE [redacted]. The government however neither [redacted]

## RELIEF REQUESTED

**WHEREFORE** Plaintiff, SDS, respectfully requests that the Court enter judgment in favor of the Plaintiff against the United States and further requests the following relief:

- that the Court enjoin ACA from continuing performance of the Contract awarded to HiPK;
- that the Court find that ACA violated the Competition in Contracting Act;

- that the Court find that ACA breached the implied contract of fair dealing with SDS;
- that the Court direct ACA to terminate the contract awarded to HiPK; and
- that the Court award SDS reasonable costs and attorneys' fees, and such further legal and equitable relief that the Court deems appropriate.

Respectfully submitted,

Date: ____________ By: ____________________________

Christopher M. Johnson,
Centre Law Group, LLC
1953 Gallows Rd, Suite 650
Vienna, VA. 22102
(703) 288-2800
(703) 288-4868 (fax)

Brian C. Caney-Of Counsel

Counsel for Plaintiff
SDS International, Inc.