Case 1:07-cv-00881-JPW Document 60 *SEALED* Filed 04/23/2008 Page 1 of 16

REDACTED VERSION

# In the United States Court of Federal Claims

**NOT FOR PUBLICATION**

No. 07-881C
Filed: April 23, 2008

SDS INTERNATIONAL, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant,

and

HiPk, LLC,

Defendant-Intervenor.

Post-Award Bid Protest: A motion for a permanent injunction will not be granted where plaintiff failed to show that the agency's evaluation of the awardee's technical proposal was arbitrary or capricious.

Christopher M. Johnson, Centre Law Group, LLC, Vienna, Virginia, counsel for plaintiff.

Robert E. Chandler, with whom were Acting Assistant Attorney General Jeffrey S. Bucholtz, Director Jeanne E. Davidson, and Assistant Director Steven J. Gillingham, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, counsel for defendant. Captain Robert T. Wu, Department of the Army, of counsel.

J. Bradley Reaves, Kaufman & Canoles, P.C., Norfolk, VA, counsel for defendant-intervenor. Terence Murphy and Patrick H. O'Donnell, of counsel.

OPINION

WIESE, Judge.

Plaintiff, SDS International, Inc. ("SDS"), an unsuccessful bidder, sues here to enjoin the performance of a contract for instructional training and related support

Case 1:07-cv-00881-JPW Document 60 *SEALED* Filed 04/23/2008 Page 2 of 16

services that was awarded to HiPk, LLC ("HiPk") by the United States Army. Plaintiff contends that HiPk, the intervenor in this action, should not have been awarded the contract because HiPk's proposal did not conform to the requirements of the solicitation.

The case is now before the court on plaintiff's motion for injunctive relief and defendant's motion for summary judgment based on the administrative record. The parties have fully briefed the issues and the court heard oral argument on April 3, 2008. For the reasons set forth below, plaintiff's motion for injunctive relief is denied and defendant's motion for summary judgment is granted.

## FACTS

On February 28, 2007, the Army, acting through the Army Contracting Agency ("the agency"), issued a solicitation seeking proposals to provide training, exercise, and operational base support services in furtherance of the Joint Tactical Air Operations Interface Training Program directed by the Joint Interoperability Division of the United States Army Forces Command. The solicitation contemplated the award of a fixed-price contract that would include a phase-in period, a base-year period, and a maximum of four option-year periods. The work to be performed under the contract was divided between base support services and potential task orders, defined under the solicitation as additional work or requirements that could be solicited in open competition. A detailed description of the work (both the base support services and the potential task orders) was set forth in a comprehensive Performance Work Statement accompanied by a Performance Requirements Summary.

The solicitation advised offerors to submit a Quality Proposal, to consist of both a written component and an oral presentation, describing the proposed approach to the work listed in the Performance Work Statement and identifying the resources necessary for its accomplishment. The solicitation, in other words, involved a performance-based contract with staffing requirements to be determined by the offeror.

Toward that end, the solicitation directed offerors to propose fixed monthly unit prices for base support services (described in section 3.0 of the Performance Work Statement) and to submit fixed hourly rates for nine specified labor categories that were applicable to potential task orders (described in section 4.3 of the Performance Work Statement). The solicitation further instructed offerors to identify key staff members (discussed in sections 3.2.7 and 4.4 of the Performance Work

Case 1:07-cv-00881-JPW Document 60 *SEALED* Filed 04/23/2008 Page 3 of 16

Statement) and to specify the minimum education, experience, and skill qualifications that would be used in hiring non-key personnel.[1]

As to the ultimate basis for award, section M.2 of the solicitation provided as follows:

> The Government will be using best value trade off procedures. Subject to the provisions of this solicitation, an award will be made to a single offeror who is deemed responsible in accordance with [Federal Acquisition Regulation] 9.104 as supplemented and whose evaluated offer is the best value in terms of all the stated evaluation factors and subfactors. The award decision will be based on an integrated assessment of the offeror's capability to perform and the risks associated with contract performance, as well as the offer considered the most advantageous to the Government, price and other factors considered. The Government reserves the right to award to other than the lowest price or the offeror with the highest ranked technical or past performance proposal. The importance of the price factor in the selection process will increase as the technical and past performance differences between proposals decrease.

On April 3, 2007, the Army received three proposals, including the proposals submitted by plaintiff and by HiPk. Pursuant to the criteria identified in the solicitation, [redacted] As to price, however, [redacted]

---

[1] Section L.3.B of the solicitation, titled "Preparation of the Proposals," specifically provided:

> Technical approach shall identify, at a minimum, the organizational structure, number of personnel performing the work in management and functional areas and job classification and methods, if any, for cross utilization of assigned personnel. A staff of key personnel with *proven qualification of leadership, education and experience* commensurate with the position proposed is considered essential for contract performance. . . . The contractor shall also identify the minimum education, experience and skill qualifications that will be used to solicit/hire non key personnel positions.

Case 1:07-cv-00881-JPW Document 66 Filed 05/07/2008 Page 4 of 16

On or about July 9, 2007, the Army notified plaintiff of its intention to award the contract to HiPk. Approximately one week later, on July 17, 2007, plaintiff filed an executive-level protest with the Army, alleging that the award to HiPk violated the Competition in Contracting Act, 10 U.S.C. § 2305(b)(1) (2000), because HiPk had [redacted] In addition, plaintiff contended that the Army had disregarded the evaluation and award criteria specified in the solicitation, first by adopting HiPk's prices as a gauge of price reasonableness rather than preparing an independent government estimate, and second by failing to conduct a reasonable price/technical trade-off analysis as required by a best-value procurement [redacted] Rather, plaintiff claimed, the agency simply made the award to the offeror with the lowest-priced technically acceptable bid. By way of relief, plaintiff requested either that the award to HiPk be set aside or that HiPk be ordered to suspend performance of the contract pending resolution of plaintiff's claims.

On July 23, 2007, while plaintiff's protest was pending, the Army provided plaintiff with a debriefing summarizing the assessed strengths and weaknesses of plaintiff's proposal relative to the requirements of the solicitation as determined by the agency's source selection evaluation board. The debriefing revealed that [redacted]

---

[2] Training Transformation is a Department of Defense policy, set forth in the DoD Training Transformation Implementation Plan of June 9, 2004, and contained in DoD's Joint Chiefs of Staff Instruction CJCSI 3500.01, that is designed to modernize military training to address evolving national security threats through, inter alia, the increased use of "knowledge enablers" (i.e., technology tools that facilitate long-distance web-based and computer-oriented instruction). We discuss this initiative more fully below.

[3] In her July 23, 2007, debriefing, the contracting officer identified as a weakness in plaintiff's management approach the fact that "[t]he proposed recommended staffing provides capability not fully supported in the [Performance Work Statement]." Elaborating on this point, the contracting officer explained:

> SDS was the single offeror who submitted a proposal that added staff personnel to address elements clearly intended as potential task orders

(continued...)

Case 1:07-cv-00881-JPW Document 60 *SEALED* Filed 04/23/2008 Page 5 of 16

The Army denied plaintiff's protest on August 21, 2007. In its written decision, the agency noted that plaintiff [redacted] ut concluded that Training Transformation requirements were addressed in the potential task order section of the contract and not under the base support services.

Following the Army's denial of its claim, plaintiff filed a protest with the Government Accountability Office ("GAO") on August 28, 2007, reasserting many of the arguments it had raised before the contracting agency. The GAO, however, limited the protest to two specific issues: (1) whether the Training Transformation initiative was addressed as a requirement in the solicitation, and if so, to what extent; and (2) whether the Army was required to conduct a price realism analysis in evaluating the proposals. At an "outcome prediction" teleconference held on November 28, 2007, the GAO rejected plaintiff's argument that the Training Transformation initiative was incorporated into the base support services identified in the solicitation, but announced that it intended to sustain the protest based on a flaw in the Army's price realism analysis.

In response to the outcome prediction conference, the Army advised the GAO that it would take corrective action regarding the price realism issue. As a result, the GAO dismissed plaintiff's protest as moot on November 30, 2007. Following the dismissal of the protest, the Army conducted a new price realism analysis based on a revised independent government estimate. Based on this analysis, the Army reaffirmed its award of the contract to HiPk. Plaintiff was notified of this outcome on December 5, 2007. On December 17, 2007, plaintiff filed suit in this court.

## DISCUSSION

### I.

To prevail on its claim for injunctive relief, plaintiff must demonstrate that the Army's decision to award the contract to HiPk was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2000). In attempting to meet this burden of proof, plaintiff once again raises the argument it presented to both the agency and the GAO: that the solicitation, properly construed, incorporates the Training Transformation initiative as part of the base

---

[3](...continued)
as a basic requirement of the [Performance Work Statement] for the base year and subsequent option years, which significantly increased the overall price.

support services and that HiPk's [redacted] Plaintiff thus argues that the Army's acceptance of a technically nonconforming proposal was incorrect as a matter of law. See, e.g., Dubinsky v. United States, 43 Fed. Cl. 243, 266 (1999) (concluding that a contract award was arbitrary and capricious where the determination that the awardee's proposal was technically acceptable was found to be unreasonable).

Defendant, for its part, describes the Training Transformation initiative as a "high-level policy" that uses "evolving training techniques to improve the way the various branches of the armed forces work together." Although defendant acknowledges that "the solicitation is an example of Training Transformation in action," it nevertheless argues that the policy of Training Transformation in general, and the Training Transformation Implementation Plan in particular, "contain no specific requirements and do not mandate the performance of any particular tasks." Defendant thus maintains that the details of implementing these principles are left to the military training community and rejects plaintiff's contentio[redacted]

The Performance Work Statement specifically references Training Transformation in two places: section 4.6, which lists DoD's Training Transformation Implementation Plan among several "directive" documents that are "cited within Section 3 Requirements relative to specific functions, actions or tasks," and section 1.1.4, which advises offerors that "the training program will adhere to Training Transformation policy and directives designed to provide dynamic, capabilities-based training for the Department of Defense (DoD) in support of national security requirements across the Services and Allied partners." As discussed above, plaintiff reads these provisions as requirin[redacted] distinguished from the potential task orders[redacted]

Like defendant, we do not read the solicitation's references to Training Transformation as imposing additional requirements above the plain language of the Performance Work Statement. In this respect, we agree with the GAO that Training Transformation is an instructional philosophy rather than a specific set of tasks. Plaintiff argues, however, that even if we construe the solicitation's references to Training Transformation as merely instructive, HiPk's proposal[redacted]

Case 1:07-cv-00881-JPW Document 60 *SEALED* Filed 04/23/2008 Page 7 of 16

[redacted]

In defendant's view, HiPk's proposal [redacted] Implicit in plaintiff's position, defendant maintains, is the unworkable assumption that the Army did not understand the services it was seeking in its solicitation. In addressing this contention, we now turn to the sections of the Performance Work Statement on which plaintiff relies.[5]

A. Section 3.1.5.13 —Development and Integration of Learning Media

Section 3.1.5.13 of the Performance Work Statement, in its entirety, required offerors to "[m]aintain virtual training devices such as the Part-Task Trainers and assist in the development and integration of learning media for use with such virtual

---

[4] Plaintiff describes the personnel and resources required under Training Transformation as "highly skilled information technology engineers and specialists necessary to facilitate Advanced Distributed Learning ("ADL"), modeling simulations and web based distance learning rather than simple class room instruction." Plaintiff additionally provides a laundry list of acronyms it characterizes as "key information technology enablers," i.e., components of Training Transformation that "promote joint training efficiency" (e.g., Joint Knowledge Development and Distribution Capability (JKDDC); Global, Live, Virtual and Constructive (L/V/C) Training; Joint National Training Capability (JNTC); Joint Assessment and Enabling Capability (JAEC); Advanced Distributed Learning (ADL); Sharable Content Object Reference Model (SCORM); and Web Based Training (WBT)/Computer Based Training (CBT)).

[5] In its initial brief, plaintiff identified the following additional sections of the Performance Work Statement as including specific references to Training Transformation enablers under the base support services: section 3.0.5, section 3.1.2.3.16, section 3.1.2.4, section 3.1.3, section 3.1.4, section 3.1.5.7, and section 3.1.8.1.1. In subsequent filings and at oral argument, however, plaintiff focused exclusively on sections 3.1.5.13 and 3.1.8.1.2 through 3.1.8.1.5, to which we now limit our discussion. It should be noted, however, that our conclusions regarding these sections apply equally to all of the sections plaintiff originally cited.

training devices."[6] Section 4.3.3—a provision dealing with potential task orders—further advised that:

> A part task trainer that emulates [Joint Interface Control Officer] equipment and can be configured to represent real life training scenarios has been developed. Further Spirals may be required to further exploit the training capability of the part task trainer. Part Task Trainer Spirals may be dependent on receiving funding from outside sources in support joint/service training initiatives.

[redacted]

> [redacted]

[redacted]

> [redacted]

Plaintiff interprets this language to mean that [redacted]

---

[6] According to defendant, a "part-task trainer" is a device resembling a computer monitor, identical to those used by soldiers in the field, that plays recorded training scenarios and allows trainers to edit those scenarios.

[redacted] Plaintiff notes [redacted].

B. <u>Sections 3.1.8.1.2 through 3.1.8.1.5—Web Master and Web Page Management</u>

Sections 3.1.8.1.2 through 3.1.8.1.5 of the Performance Work Statement listed specific functions related to the design and building of web structures and the construction of web sites. Under section 3.1.8.1.2, for instance, offerors were directed to “[d]esign and build Web site structures, provide web graphic support, and scan and link training files and materials to support in-garrison and the distance learning courses.” Similarly, section 3.1.8.1.5 required offerors to “[c]onstruct Web sites for organizing and linking course-related resources to support distance learning.” [redacted]

[7] Plaintiff supports its interpretation of the requirements of section 3.1.5.13 with reference to section 3.1.2.3.11 of the Performance Work Statement which, it contends, includes software as an example of learning media. Section 3.1.2.3.11 specifically directs the contractor to “[p]rovide the [Joint Multi Tactical Data Link School] Director via the designated [Contracting Officer’s Technical Representative] the following documentation (on-site in digital media and hard copy) to support each training module, as required by the government . . . L. Software.”

[redacted]

* * *

[redacted]

* * *

[redacted]

[redacted]

---

[redacted]

(continued...)

[redacted]

II.

Despite the court's difficulty in deciphering the myriad of military acronyms contained in this protest, the fundamental problem in the case is very straightforward: the parties simply cannot agree on the level of technological sophistication the base support services require. Plaintiff interprets the phrase "learning media" in section 3.1.5.13, for instance, as encompassing software development and accordingly [redacted] HiPk and the government, by contrast, maintain that the contemplated "learning media" need be no more complicated than paper handouts to be used with the part-task trainers—materials easily developed by the 12 Joint Interface Control Officer instructors required by the contract and included in both offerors proposals (as defendant contends was the case under the predecessor contract performed by plaintiff).

As a result of such differences in interpretation, plaintiff propose[redacted]

Plaintiff itself acknowledges, howeve[redacted] Plaintiff's entire protest thus amounts to the[redacted]

---

[redacted]

[redacted]

Central to the determination of whether the award to HiPk was legitimate is an assessment of whether the Army was reasonable in judging HiPk capable of performing the contract. Under the terms of the solicitation, the Army evaluated an offeror's proposal "to assess the offeror's understanding of the requirements, soundness of approach, and the ability to execute the approach." Employing that standard, the Army deemed HiPk's [redacted]

| Adjectival Rating | Definition |
|---|---|
| Very Good | Proposal demonstrates good understanding of requirements and approach that exceeds performance or capability standards. Has one or more strengths that will benefit the Government. |
| Low Risk | Little doubt exists, based on the Offeror's performance record, that the Offeror can perform the proposed effort. |

In assessing HiPk's understanding of the solicitation's requirements and its ability to meet them, the Army could not reasonably have expected HiPk, in proposing its key personnel, to repeat every task set forth in the Performance Work Statement to demonstrate the candidate's qualifications. The same is especially true for non-key personnel, for whom, by definition, much less was required by way of identification and documentation. (In contrast to the requirements set forth in section 3.2.7 of the Performance Work Statement for key personnel, offerors had no obligation to identify non-key personnel by name, provide the Army with copies of their resumes, or avoid their replacement for the first six months of contract performance.) We therefore do not find [redacted] fatal to the Army's determination that HiPk was capable of performing the contract.

It should additionally be noted that the [redacted] Given

---

9 [redacted]

(continued...)

[redacted]

---

[9]([redacted]nued)

[redacted]

Case 1:07-cv-00881-JPW Document 66 Filed 05/07/2008 Page 14 of 16

find that the Army was more than [redacted]

Finally, ample evidence exists that plaintiff's objections to the contract award were considered extensively by the contracting officer. In her September 24, 2007, statement of facts prepared in connection with plaintiff's protest before the GAO, for instance, the contracting officer detailed her findings regarding the challenged sections of the Performance Work Statement as follows:

> In some respects, SDS's proposal failed to fully cross utilize assigned personnel, resulting in it being forced to propose more individuals or resources than had cross utilization been more emphasized. . . . SDS [redacted]here are currently no contractors performing these duties for the [Joint Interoperability Division] and there are no new requirements that would require them to do so. Finally, SDS included [redacted] proposal. This person would be required to support task orders listed in paragraph 4.3 Technical Exhibit III: Potential Task Orders of the [Performance Work Statement]. To the extent that [Web Based Training/Computer Based Training] functions are included in the basic requirements that work might have been better addressed by cross utilizing existing personnel.

More particularly, the contracting officer addressed the very sections of the Performance Work Statement now before us as follows:

> Paragraph 3.1.5.13 includes reference to "Maintain virtual training devices such as the Part Task Trainers and assist in the development and integration of learning media for use with such virtual training devices." The Part-Task Trainers were developed by SDS under specific task orders of their contract. Part of the requirement was to develop the PTTs so that [Joint Interface Control Officers] instructors and military staff would be able to maintain and update the data and media files to maintain relevance and to add to the basic capability that was provided by task order.
>
> * * *
>
> Paragraph 3.1.8.1.2 includes reference to "Design and build Web site structures, provide web graphic support, and scan and link training files and materials to support in-garrison and the distance learning

> courses." This is a Web Master task and is not a [Training Transformation initiative] requirement.
>
> * * *
>
> Paragraph 3.1.8.1.5 includes reference to "Construct Web sites for organizing and linking course-related resources to support distance learning." This is a Web Master task and is not a [Training Transformation] requirement.

In light of the fact that the contracting officer specifically and comprehensively addressed plaintiff's core contention that [redacted] we simply cannot conclude, as plaintiff has urged us to do, that the contracting officer did not understand the terms of the solicitation.

In the final analysis, then, we conclude that plaintiff proposed a level of technological expertise that the Army did not seek and that the language of the solicitation did not require. To the extent that the tasks in the base support services implicated concepts associated with Training Transformation, we additionally conclude that HiPk's proposal adequately addressed these requirements. We thus find no fault with the Army's evaluation of HiPk's technical approach.

III.

Plaintiff raised an objection before the agency and the GAO regarding the Army's perceived failure to conduct a proper price realism analysis since the Army allegedly compared HiPk's technical approach to HiPk's price rather than to an independent government estimate and deemed HiPk's [redacted] despite the fact that HiPk's proposal offere[redacted]

We find this argument, however, to be subsumed by the Training Transformation issue—by determining that the Army committed no erro[redacted] Plaintiff's price realism argument, in other words, is simply another way of challengin[redacted] Nevertheless, we find plaintiff's assertions regarding price realism to be without merit. As the contracting officer explained: "each offeror's price proposal was evaluated for reasonableness and balance. Each offeror's price proposal was evaluated against the [independent government estimate] and other offers received. Additionally, each offeror's price proposal was compared against the evaluated technical proposal in order to formulate

Case 1:07-cv-00881-JPW Document 66 Filed 05/07/2008 Page 16 of 16

a price risk rating for each offeror." We thus have no reason to conclude, as plaintiff posits, that the contracting officer misunderstood the concept of price realism.

## CONCLUSION

For the reasons set forth above, plaintiff's motion for injunctive relief is denied and defendant's motion for summary judgment is granted. Accordingly, the Clerk is directed to enter judgment for defendant and dismiss plaintiff's complaint.