# In the United States Court of Federal Claims

**NOT FOR PUBLICATION**

No. 07-881C
Filed: April 23, 2008
Reissued: May 8, 2008*

| | | |
|---|---|---|
| SDS INTERNATIONAL, INC., | ) | |
| Plaintiff, | ) | Post-Award Bid Protest: A motion for a permanent injunction will not be granted where plaintiff failed to show that the agency's evaluation of the awardee's technical proposal was arbitrary or capricious. |
| v. | ) | |
| THE UNITED STATES, | ) | |
| Defendant, | ) | |
| and | ) | |
| HiPk, LLC, | ) | |
| Defendant-Intervenor. | ) | |

Christopher M. Johnson, Centre Law Group, LLC, Vienna, Virginia, counsel for plaintiff.

Robert E. Chandler, with whom were Acting Assistant Attorney General Jeffrey S. Bucholtz, Director Jeanne E. Davidson, and Assistant Director Steven J. Gillingham, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, counsel for defendant. Captain Robert T. Wu, Department of the Army, of counsel.

J. Bradley Reaves, Kaufman & Canoles, P.C., Norfolk, VA, counsel for defendant-intervenor. Terence Murphy and Patrick H. O'Donnell, of counsel.

---

* The court originally issued this opinion under seal on April 23, 2008, pursuant to the protective order issued on December 18, 2007. After discussion with the parties, the court is reissuing the opinion in conformance with the E-Government Act of 2002.

OPINION

WIESE, Judge.

Plaintiff, SDS International, Inc. ("SDS"), an unsuccessful bidder, sues here to enjoin the performance of a contract for instructional training and related support services that was awarded to HiPk, LLC ("HiPk") by the United States Army. Plaintiff contends that HiPk, the intervenor in this action, should not have been awarded the contract because HiPk's proposal did not conform to the requirements of the solicitation.

The case is now before the court on plaintiff's motion for injunctive relief and defendant's motion for summary judgment based on the administrative record. The parties have fully briefed the issues and the court heard oral argument on April 3, 2008. For the reasons set forth below, plaintiff's motion for injunctive relief is denied and defendant's motion for summary judgment is granted.

FACTS

On February 28, 2007, the Army, acting through the Army Contracting Agency ("the agency"), issued a solicitation seeking proposals to provide training, exercise, and operational base support services in furtherance of the Joint Tactical Air Operations Interface Training Program directed by the Joint Interoperability Division of the United States Army Forces Command. The solicitation contemplated the award of a fixed-price contract that would include a phase-in period, a base-year period, and a maximum of four option-year periods. The work to be performed under the contract was divided between base support services and potential task orders, defined under the solicitation as additional work or requirements that could be solicited in open competition. A detailed description of the work (both the base support services and the potential task orders) was set forth in a comprehensive Performance Work Statement accompanied by a Performance Requirements Summary.

The solicitation advised offerors to submit a Quality Proposal, to consist of both a written component and an oral presentation, describing the proposed approach to the work listed in the Performance Work Statement and identifying the resources necessary for its accomplishment. The solicitation, in other words, involved a performance-based contract with staffing requirements to be determined by the offeror.

Toward that end, the solicitation directed offerors to propose fixed monthly unit prices for base support services (described in section 3.0 of the Performance

Work Statement) and to submit fixed hourly rates for nine specified labor categories that were applicable to potential task orders (described in section 4.3 of the Performance Work Statement). The solicitation further instructed offerors to identify key staff members (discussed in sections 3.2.7 and 4.4 of the Performance Work Statement) and to specify the minimum education, experience, and skill qualifications that would be used in hiring non-key personnel.[1]

As to the ultimate basis for award, section M.2 of the solicitation provided as follows:

> The Government will be using best value trade off procedures. Subject to the provisions of this solicitation, an award will be made to a single offeror who is deemed responsible in accordance with [Federal Acquisition Regulation] 9.104 as supplemented and whose evaluated offer is the best value in terms of all the stated evaluation factors and subfactors. The award decision will be based on an integrated assessment of the offeror's capability to perform and the risks associated with contract performance, as well as the offer considered the most advantageous to the Government, price and other factors considered. The Government reserves the right to award to other than the lowest price or the offeror with the highest ranked technical or past performance proposal. The importance of the price factor in the selection process will increase as the technical and past performance differences between proposals decrease.

On April 3, 2007, the Army received three proposals, including the proposals submitted by plaintiff and by HiPk. Pursuant to the criteria identified in the solicitation, plaintiff's and HiPk's proposals each received a technical rating of "Very Good (Low Risk)." As to price, however, the offerors' bids diverged significantly, ranging from a high bid of $28.4 million by plaintiff to a low bid of $17.7 million by

---

[1] Section L.3.B of the solicitation, titled "Preparation of the Proposals," specifically provided:

> Technical approach shall identify, at a minimum, the organizational structure, number of personnel performing the work in management and functional areas and job classification and methods, if any, for cross utilization of assigned personnel. A staff of key personnel with proven qualification of leadership, education and experience commensurate with the position proposed is considered essential for contract performance. . . . The contractor shall also identify the minimum education, experience and skill qualifications that will be used to solicit/hire non key personnel positions.

the third offeror, C2 Technologies. By contrast, HiPk's bid was $22.7 million, a figure slightly more than the government's own independent estimate of $22.5 million.

On or about July 9, 2007, the Army notified plaintiff of its intention to award the contract to HiPk. Approximately one week later, on July 17, 2007, plaintiff filed an executive-level protest with the Army, alleging that the award to HiPk violated the Competition in Contracting Act, 10 U.S.C. § 2305(b)(1) (2000), because HiPk had failed to offer key and non-key personnel, as well as sufficient resources, to meet all of the requirements contained in the solicitation relating to the Department of Defense's ("DoD") Training Transformation initiative.[2] In addition, plaintiff contended that the Army had disregarded the evaluation and award criteria specified in the solicitation, first by adopting HiPk's prices as a gauge of price reasonableness rather than preparing an independent government estimate, and second by failing to conduct a reasonable price/technical trade-off analysis as required by a best-value procurement (i.e., an examination of whether the relative merits of plaintiff's and HiPk's technical approaches justified the higher prices in plaintiff's proposal). Rather, plaintiff claimed, the agency simply made the award to the offeror with the lowest-priced technically acceptable bid. By way of relief, plaintiff requested either that the award to HiPk be set aside or that HiPk be ordered to suspend performance of the contract pending resolution of plaintiff's claims.

On July 23, 2007, while plaintiff's protest was pending, the Army provided plaintiff with a debriefing summarizing the assessed strengths and weaknesses of plaintiff's proposal relative to the requirements of the solicitation as determined by the agency's source selection evaluation board. The debriefing revealed that while plaintiff's technical proposal was regarded as praiseworthy overall, it nevertheless contemplated a level of staffing (and consequently included associated costs) that the evaluation board regarded as excessive for the successful accomplishment of the solicitation's basic work requirements.[3]

---

[2] Training Transformation is a Department of Defense policy, set forth in the DoD Training Transformation Implementation Plan of June 9, 2004, and contained in DoD's Joint Chiefs of Staff Instruction CJCSI 3500.01, that is designed to modernize military training to address evolving national security threats through, inter alia, the increased use of "knowledge enablers" (i.e., technology tools that facilitate long-distance web-based and computer-oriented instruction). We discuss this initiative more fully below.

[3] In her July 23, 2007, debriefing, the contracting officer identified as a weakness in plaintiff's management approach the fact that "[t]he proposed recommended staffing provides capability not fully supported in the [Performance
(continued...)

The Army denied plaintiff's protest on August 21, 2007. In its written decision, the agency noted that plaintiff was the sole offeror whose technical approach included staff personnel to address the Training Transformation initiative as part of the base support services, but concluded that Training Transformation requirements were addressed in the potential task order section of the contract and not under the base support services.

Following the Army's denial of its claim, plaintiff filed a protest with the Government Accountability Office ("GAO") on August 28, 2007, reasserting many of the arguments it had raised before the contracting agency. The GAO, however, limited the protest to two specific issues: (1) whether the Training Transformation initiative was addressed as a requirement in the solicitation, and if so, to what extent; and (2) whether the Army was required to conduct a price realism analysis in evaluating the proposals. At an "outcome prediction" teleconference held on November 28, 2007, the GAO rejected plaintiff's argument that the Training Transformation initiative was incorporated into the base support services identified in the solicitation, but announced that it intended to sustain the protest based on a flaw in the Army's price realism analysis.

In response to the outcome prediction conference, the Army advised the GAO that it would take corrective action regarding the price realism issue. As a result, the GAO dismissed plaintiff's protest as moot on November 30, 2007. Following the dismissal of the protest, the Army conducted a new price realism analysis based on a revised independent government estimate. Based on this analysis, the Army reaffirmed its award of the contract to HiPk. Plaintiff was notified of this outcome on December 5, 2007. On December 17, 2007, plaintiff filed suit in this court.

## DISCUSSION

### I.

To prevail on its claim for injunctive relief, plaintiff must demonstrate that the Army's decision to award the contract to HiPk was "arbitrary, capricious, an

---

[3](...continued)
Work Statement]." Elaborating on this point, the contracting officer explained:

> SDS was the single offeror who submitted a proposal that added staff personnel to address elements clearly intended as potential task orders as a basic requirement of the [Performance Work Statement] for the base year and subsequent option years, which significantly increased the overall price.

abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2000). In attempting to meet this burden of proof, plaintiff once again raises the argument it presented to both the agency and the GAO: that the solicitation, properly construed, incorporates the Training Transformation initiative as part of the base support services and that HiPk's proposal failed to include sufficient staffing and resources to address those requirements. Plaintiff thus argues that the Army's acceptance of a technically nonconforming proposal was incorrect as a matter of law. See, e.g., Dubinsky v. United States, 43 Fed. Cl. 243, 266 (1999) (concluding that a contract award was arbitrary and capricious where the determination that the awardee's proposal was technically acceptable was found to be unreasonable).

Defendant, for its part, describes the Training Transformation initiative as a "high-level policy" that uses "evolving training techniques to improve the way the various branches of the armed forces work together." Although defendant acknowledges that "the solicitation is an example of Training Transformation in action," it nevertheless argues that the policy of Training Transformation in general, and the Training Transformation Implementation Plan in particular, "contain no specific requirements and do not mandate the performance of any particular tasks." Defendant thus maintains that the details of implementing these principles are left to the military training community and rejects plaintiff's contention that compliance with the Training Transformation initiative requires staffing or resources above and beyond those explicitly set forth in the solicitation.

The Performance Work Statement specifically references Training Transformation in two places: section 4.6, which lists DoD's Training Transformation Implementation Plan among several "directive" documents that are "cited within Section 3 Requirements relative to specific functions, actions or tasks," and section 1.1.4, which advises offerors that "the training program will adhere to Training Transformation policy and directives designed to provide dynamic, capabilities-based training for the Department of Defense (DoD) in support of national security requirements across the Services and Allied partners." As discussed above, plaintiff reads these provisions as requiring offerors to incorporate Training Transformation personnel and resources as part of the base support services aspect of the contract (as distinguished from the potential task orders); defendant, by contrast, interprets these sections as requiring offerors to address Training Transformation explicitly only when Training Transformation documents are expressly cited in section 3 of the Performance Work Statement, and in all other cases simply to ensure that their proposals adhere to (i.e., are not in conflict with) Training Transformation.

Like defendant, we do not read the solicitation's references to Training Transformation as imposing additional requirements above the plain language of the Performance Work Statement. In this respect, we agree with the GAO that Training Transformation is an instructional philosophy rather than a specific set of tasks.

Plaintiff argues, however, that even if we construe the solicitation's references to Training Transformation as merely instructive, HiPk's proposal nevertheless failed to address explicit mandates set forth in the Performance Work Statement—specifically sections 3.1.5.13 and 3.1.8.1.2 through 3.1.8.1.5—all of which, in plaintiff's view, expressly require the use of Training Transformation resources as part of the base support services.

In defendant's view, HiPk's proposal fully and explicitly addressed every task set forth in the Performance Work Statement, including those involving what plaintiff describes as Training Transformation enablers.[4] Implicit in plaintiff's position, defendant maintains, is the unworkable assumption that the Army did not understand the services it was seeking in its solicitation. In addressing this contention, we now turn to the sections of the Performance Work Statement on which plaintiff relies.[5]

A. Section 3.1.5.13 —Development and Integration of Learning Media

Section 3.1.5.13 of the Performance Work Statement, in its entirety, required offerors to "[m]aintain virtual training devices such as the Part-Task Trainers and assist in the development and integration of learning media for use with such virtual

---

[4] Plaintiff describes the personnel and resources required under Training Transformation as "highly skilled information technology engineers and specialists necessary to facilitate Advanced Distributed Learning ("ADL"), modeling simulations and web based distance learning rather than simple class room instruction." Plaintiff additionally provides a laundry list of acronyms it characterizes as "key information technology enablers," i.e., components of Training Transformation that "promote joint training efficiency" (e.g., Joint Knowledge Development and Distribution Capability (JKDDC); Global, Live, Virtual and Constructive (L/V/C) Training; Joint National Training Capability (JNTC); Joint Assessment and Enabling Capability (JAEC); Advanced Distributed Learning (ADL); Sharable Content Object Reference Model (SCORM); and Web Based Training (WBT)/Computer Based Training (CBT)).

[5] In its initial brief, plaintiff identified the following additional sections of the Performance Work Statement as including specific references to Training Transformation enablers under the base support services: section 3.0.5, section 3.1.2.3.16, section 3.1.2.4, section 3.1.3, section 3.1.4, section 3.1.5.7, and section 3.1.8.1.1. In subsequent filings and at oral argument, however, plaintiff focused exclusively on sections 3.1.5.13 and 3.1.8.1.2 through 3.1.8.1.5, to which we now limit our discussion. It should be noted, however, that our conclusions regarding these sections apply equally to all of the sections plaintiff originally cited.

training devices."[6] Section 4.3.3—a provision dealing with potential task orders—further advised that:

> A part task trainer that emulates [Joint Interface Control Officer] equipment and can be configured to represent real life training scenarios has been developed. Further Spirals may be required to further exploit the training capability of the part task trainer. Part Task Trainer Spirals may be dependent on receiving funding from outside sources in support joint/service training initiatives.

HiPk addressed section 3.1.5.13 in its technical proposal as follows:

> Use of Part Task Trainers or other virtual training devices will be incorporated into training events where they meet the training objectives of the involved units. Part-Task Trainers (PTT) will be maintained in the same fashion as operational software under the base contract. The [Operations Support Branch] Lead will provide personnel to perform installation and corrective maintenance (reloading, system maintenance, anti-viral and security protection etc.) and training in PTT use and functionality, but will not develop software upgrades.

As to "Part-Task Trainer Spirals," HiPk's proposal additionally provided:

> Possible development of Part-Task Trainer Spirals is a task which the HiPk team can support through either development of training scenarios or through development of [Joint Interface Control Officer] cell hardware emulation. The team has broad experience in developing emulation devices for [Tactical Data Link] and communication systems. The team also has experience in scenario development using operational knowledge of current capabilities, limitations and Tactics, Techniques and Procedures (TTP) of the operational forces.

Plaintiff interprets this language to mean that HiPk intended to address section 3.1.5.13 only through future task orders and did not intend to develop software upgrades, despite the section's clear directive that the offeror "assist in the

---

[6] According to defendant, a "part-task trainer" is a device resembling a computer monitor, identical to those used by soldiers in the field, that plays recorded training scenarios and allows trainers to edit those scenarios.

development . . . of learning media."[7] Plaintiff notes that its proposal, by contrast, included a Modeling and Simulation Planner as a full-time base staff position to assist in the development of learning media since the solicitation called for development assistance and not simply maintenance.

B. Sections 3.1.8.1.2 through 3.1.8.1.5—Web Master and Web Page Management

Sections 3.1.8.1.2 through 3.1.8.1.5 of the Performance Work Statement listed specific functions related to the design and building of web structures and the construction of web sites. Under section 3.1.8.1.2, for instance, offerors were directed to "[d]esign and build Web site structures, provide web graphic support, and scan and link training files and materials to support in-garrison and the distance learning courses." Similarly, section 3.1.8.1.5 required offerors to "[c]onstruct Web sites for organizing and linking course-related resources to support distance learning." HiPk addressed these requirements in its proposal as follows:

> The ISD [Instructional System Design] Manager is responsible to the [Joint Multi Tactical Data Link School] Director for all matters concerning the Instructional System Design (ISD) process used for planning, developing, implementing, and managing all [Joint Multi Tactical Data Link School] instructional systems. . . . The ISD Manager is tasked with supervising and ensuring the proper conduct and execution of the formatting and presentation of [Joint Multi Tactical Data Link School] courseware, and employment of information technology (IT) both in the local classroom setting and during Distance Learning (DL) and Mobile Training Team (MTT) course instruction. Additionally, the ISD Manager will oversee web site information quality and updates, database creation and management, receipt, tracking and analysis of course critiques, SCORM [Sharable Content Object Reference Model] implementation, the [Quality Assurance Surveillance Plan] for curriculum, courseware, materials, and classroom, DL, and MTT instruction procedures. The ISD Manager will develop, implement, and manage a Curriculum Control Plan and Course Evaluation Plan. . . . The ISD Manager will also

[7] Plaintiff supports its interpretation of the requirements of section 3.1.5.13 with reference to section 3.1.2.3.11 of the Performance Work Statement which, it contends, includes software as an example of learning media. Section 3.1.2.3.11 specifically directs the contractor to "[p]rovide the [Joint Multi Tactical Data Link School] Director via the designated [Contracting Officer's Technical Representative] the following documentation (on-site in digital media and hard copy) to support each training module, as required by the government . . . L. Software."

> coordinate with Web/Computer Based Training Lead for assistance with ISD and SCORM procedures implementation.
>
> * * *
>
> Additionally, under the direction of the HiPk ISD Manager, the Data Base Manager will be assigned to perform Web Design, Web Page modification and updates and general web support for the [Joint Interoperability Division]. Specific support tasks include working with the Librarian to ensure training materials stored in the library are accessible via the web to students within the [Joint Interoperability Division], posting approved training materials to world wide web accessible sites, supporting access of remote sites which contain relevant training materials for use by the [Joint Interoperability Division] staff and students, and linking training materials for use during distance learning events.
>
> * * *
>
> Under the direction of the HiPk Program Manager a staff of personnel will support the [Joint Interoperability Division] technological infrastructure. Personnel will be assigned primary tasks and will provide specific areas of support, while at the same time being able to support other IT related tasks. These positions include an Information Systems/Network Administrator, a Database Manager/Web Master, a Librarian, and the Logistician (also serves as [Joint Interface Control Officer] Comm).

Plaintiff characterizes HiPk's technical approach as assigning web design and development functions to a Data Base Manager who, although overseen by an ISD Manager, possesses no specified experience in web design or development under the table of qualifications identified by HiPk in its proposal.[8] Plaintiff thus argues that

---

[8] HiPk's proposal identified the "Minimum Education and Skills for Non-key Personnel" in table format as follows:

| | |
|---|---|
| Position: | IS/Network Admin or [Data Base Manager] |
| Education: | AA/AS in Information Systems or other related field OR technical training in computer systems and networks, 3 years experience in Network Administration may be substituted for degree |
| Qualification: | [Microsoft Certified Systems Engineer] certification desired |

(continued...)

HiPk's proposal failed to identify any qualified non-key staff that would actually design and build web structures or provide graphics support under base support services as required by sections 3.1.8.1.2 through 3.1.8.1.5. Plaintiff points out that its proposal, by contrast, assigned four qualified full-time equivalent positions to web design and construction, including a graphics designer, an Advanced Distributed Learning programmer, and an Advanced Distributed Learning specialist.

II.

Despite the court's difficulty in deciphering the myriad of military acronyms contained in this protest, the fundamental problem in the case is very straightforward: the parties simply cannot agree on the level of technological sophistication the base support services require. Plaintiff interprets the phrase "learning media" in section 3.1.5.13, for instance, as encompassing software development and accordingly devoted an ISD Manager and a graphics specialist to the task. HiPk and the government, by contrast, maintain that the contemplated "learning media" need be no more complicated than paper handouts to be used with the part-task trainers—materials easily developed by the 12 Joint Interface Control Officer instructors required by the contract and included in both offerors proposals (as defendant contends was the case under the predecessor contract performed by plaintiff).

As a result of such differences in interpretation, plaintiff proposed a total of six full-time employees—a modeling and simulation planner, an Advanced Distributed Learning programmer, an Advanced Distributed Learning specialist, a Web Based Training/Computer Based Training specialist, an Advanced Distributed Learning graphics specialist, and a web/data base manager—as base contract personnel assigned to address Training Transformation enablers, whereas HiPk assigned those same functions to a Data Base Manager supervised by an ISD Manager.

Plaintiff itself acknowledges, however, that HiPk's proposal and technical approach referenced the same Training Transformation enablers with which we are now concerned. Plaintiff's entire protest thus amounts to the criticism that HiPk's table of minimum education and skill qualifications for non-key personnel contained in its proposal included no reference to software development, web design, or

---

[8](...continued)
Years
Experience: 3 years working with MS Office, Windows, NT, and Website admin

graphics support and that the Army was therefore unreasonable in concluding that HiPk could satisfy those aspects of the contract.

Central to the determination of whether the award to HiPk was legitimate is an assessment of whether the Army was reasonable in judging HiPk capable of performing the contract. Under the terms of the solicitation, the Army evaluated an offeror's proposal "to assess the offeror's understanding of the requirements, soundness of approach, and the ability to execute the approach." Employing that standard, the Army deemed HiPk's technical approach to be "Very Good (Low Risk)," a rating defined in the solicitation as follows:

| Adjectival Rating | Definition |
|---|---|
| Very Good | Proposal demonstrates good understanding of requirements and approach that exceeds performance or capability standards. Has one or more strengths that will benefit the Government. |
| Low Risk | Little doubt exists, based on the Offeror's performance record, that the Offeror can perform the proposed effort. |

In assessing HiPk's understanding of the solicitation's requirements and its ability to meet them, the Army could not reasonably have expected HiPk, in proposing its key personnel, to repeat every task set forth in the Performance Work Statement to demonstrate the candidate's qualifications. The same is especially true for non-key personnel, for whom, by definition, much less was required by way of identification and documentation. (In contrast to the requirements set forth in section 3.2.7 of the Performance Work Statement for key personnel, offerors had no obligation to identify non-key personnel by name, provide the Army with copies of their resumes, or avoid their replacement for the first six months of contract performance.) We therefore do not find the lack of any reference to web site development or graphics support in the job description of a data base manager to whom those tasks were explicitly assigned by HiPk fatal to the Army's determination that HiPk was capable of performing the contract.

It should additionally be noted that the HiPk employee charged with ultimate responsibility for the disputed tasks—ISD Manager George Hand—was an individual with extensive experience in the field,[9] a fact plaintiff itself conceded.[10] Given

---

[9] In its proposal, HiPk identified Mr. George Hand as its ISD Manager and described his credentials as follows:

> Mr. Hand has a Master of Science in Administration Degree, with

(continued...)

Mr. Hand's impressive credentials and his role overseeing the challenged tasks, we

---

[9](...continued)

> emphasis in ISD [Instructional System Design] training management. He is also a graduate of the USAF War College with a Master's Degree Equivalent in personnel & program management. Additional ISD training includes an 80-hour ISD course at the University of Georgia and multiple professional courses on Project Management & e-Learning conducted at previous job sites. In addition, Mr. Hand completed requirements needed to perform as an USAF Air Training Command Flight Instructor and Classroom Instructor/Curriculum Developer.
>
> Mr. Hand served 20 years as an USAF aviation officer with numerous training related assignments where he managed and conducted multi-cultural training activities. After his USAF career, he has 16 years of experience designing and managing ISD, e-Learning, and classroom training systems and curriculum. As a training instructor and Program Development Manager for Pan Am Airlines and Operations ISD Developer and Instructor for Delta Airlines, Mr. Hand used ISD principals and processes to develop, manage, instruct, and maintain numerous multimedia training programs for aviators. As a Team Leader he managed entire e-Learning projects and personnel. Mr. Hand also performed as the Flight Publications Supervisor for Delta Airlines, where he managed a publication staff and all pilot operational and reference technical manuals for seven different aircraft types. . . . From 1995 through 2005, as a Senior Learning Designer and Project Manager for Delta Airlines, he designed, managed, and implemented a multitude of ISD Computer Based and Web Based Training technical programs. . . . Within the last two years, Mr. Hand has managed and implemented several complex ISD Computer Based Training (CBT), Web Based Training (WBT), and Instructor Led Training projects in support of the U.S. Department of Homeland Security. He has also performed as an ISD Consultant, where he designed highly technical, performance-based medical Web training programs for Healthcare Services, including multifaceted computer applications for an entire medical/hospital staff.

[10] Plaintiff's counsel acknowledged at oral argument that Mr. Hand had extensive experience in the field and noted that if Mr. Hand had been assigned primary responsibility for web development and graphics support (rather than managerial oversight), "that would be sufficient."

find that the Army was more than justified in characterizing HiPk's technical proposal as "Very Good (Low Risk)."

Finally, ample evidence exists that plaintiff's objections to the contract award were considered extensively by the contracting officer. In her September 24, 2007, statement of facts prepared in connection with plaintiff's protest before the GAO, for instance, the contracting officer detailed her findings regarding the challenged sections of the Performance Work Statement as follows:

> In some respects, SDS's proposal failed to fully cross utilize assigned personnel, resulting in it being forced to propose more individuals or resources than had cross utilization been more emphasized. . . . SDS also included an [Advanced Distributed Learning] Programmer and an [Advanced Distributed Learning] Graphics Specialist in its proposal. There are currently no contractors performing these duties for the [Joint Interoperability Division] and there are no new requirements that would require them to do so. Finally, SDS included a [Web Based Training/Computer Based Training] Specialist in its proposal. This person would be required to support task orders listed in paragraph 4.3 Technical Exhibit III: Potential Task Orders of the [Performance Work Statement]. To the extent that [Web Based Training/Computer Based Training] functions are included in the basic requirements that work might have been better addressed by cross utilizing existing personnel.

More particularly, the contracting officer addressed the very sections of the Performance Work Statement now before us as follows:

> Paragraph 3.1.5.13 includes reference to "Maintain virtual training devices such as the Part Task Trainers and assist in the development and integration of learning media for use with such virtual training devices." The Part-Task Trainers were developed by SDS under specific task orders of their contract. Part of the requirement was to develop the PTTs so that [Joint Interface Control Officers] instructors and military staff would be able to maintain and update the data and media files to maintain relevance and to add to the basic capability that was provided by task order.
>
> * * *
>
> Paragraph 3.1.8.1.2 includes reference to "Design and build Web site structures, provide web graphic support, and scan and link training files and materials to support in-garrison and the distance learning

> courses." This is a Web Master task and is not a [Training Transformation initiative] requirement.
>
> * * *
>
> Paragraph 3.1.8.1.5 includes reference to "Construct Web sites for organizing and linking course-related resources to support distance learning." This is a Web Master task and is not a [Training Transformation] requirement.

In light of the fact that the contracting officer specifically and comprehensively addressed plaintiff's core contention that the disputed sections of the Performance Work Statement required technological know-how far more sophisticated than HiPk had proposed, we simply cannot conclude, as plaintiff has urged us to do, that the contracting officer did not understand the terms of the solicitation.

In the final analysis, then, we conclude that plaintiff proposed a level of technological expertise that the Army did not seek and that the language of the solicitation did not require. To the extent that the tasks in the base support services implicated concepts associated with Training Transformation, we additionally conclude that HiPk's proposal adequately addressed these requirements. We thus find no fault with the Army's evaluation of HiPk's technical approach.

III.

Plaintiff raised an objection before the agency and the GAO regarding the Army's perceived failure to conduct a proper price realism analysis since the Army allegedly compared HiPk's technical approach to HiPk's price rather than to an independent government estimate and deemed HiPk's performance risk low despite the fact that HiPk's proposal offered fewer staff positions and a $1.7 million lower price than the revised government estimate.

We find this argument, however, to be subsumed by the Training Transformation issue—by determining that the Army committed no error in finding HiPk's proposal technically acceptable, we have no need to address plaintiff's price realism claim. Plaintiff's price realism argument, in other words, is simply another way of challenging the technical sufficiency of HiPk's proposal. Nevertheless, we find plaintiff's assertions regarding price realism to be without merit. As the contracting officer explained: "each offeror's price proposal was evaluated for reasonableness and balance. Each offeror's price proposal was evaluated against the [independent government estimate] and other offers received. Additionally, each offeror's price proposal was compared against the evaluated technical proposal in order to formulate

a price risk rating for each offeror." We thus have no reason to conclude, as plaintiff posits, that the contracting officer misunderstood the concept of price realism.

## CONCLUSION

For the reasons set forth above, plaintiff's motion for injunctive relief is denied and defendant's motion for summary judgment is granted. Accordingly, the Clerk is directed to enter judgment for defendant and dismiss plaintiff's complaint.

s/John P. Wiese
John P. Wiese
Judge